**SCHIFFMAN LAW OFFICE, P.C.**
HELPING THE INJURED AND DISABLED SINCE 1975

Lisa Counters, 016436
4506 N 12th Street
Phoenix, AZ 85014-4246
Voice: (602) 266-2667, Ext. 106
Fax: (602) 266-0141
Lisa@schiffmanlaw.com
Attorney for Plaintiff

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Scott M. Archer,<br><br>　　　　　Plaintiff,<br><br>vs.<br><br>UnitedHealthcare Services, Inc., a foreign corporation; UnitedHealth Group, Inc., a foreign corporation; UnitedHealthcare Life Insurance Company, a foreign corporation; All Savers Insurance Company, a foreign corporation; Barclay Group Development Services Health Benefit Plan,<br><br>　　　　　Defendants | CASE NO.<br><br>**COMPLAINT** |

Defendant Scott Archer ("Archer") for his Complaint against Defendants alleges as follows:

**PARTIES**

1. Scott Archer is a married person. At all relevant times, Archer worked for Barclay Group Development Services, LLC ("Barclay") and continues to work for Barclay. Archer is a resident of Maricopa County, Arizona.

2. Defendant United HealthCare Services, Inc., ("UHC Services") is a Minnesota corporation authorized and continuing to do business in Maricopa County, Arizona.

3. Defendant All Savers Insurance Company ("All Savers") is a foreign corporation authorized and continuing to do business in Maricopa County, Arizona. All Savers is a wholly-owned subsidiary of UHC.

4. Defendant UnitedHealth Group, Inc. ("UHG") is a Delaware corporation with its principal place of business in Minnesota and is the parent corporation for All Savers and UHC Services.

5. Defendant UnitedHealthcare Life Insurance Company ("UHLIC") conducts utilization review of health care services on behalf of All Savers and UHC Services.

6. Defendant Barclay Group Development Services Welfare Benefit Plan ("Plan") is an ERISA plan created to provide Barclay employees with health insurance.

7. Barclay and its employees made financial contributions to fund the Plan.

## JURISDICTION AND VENUE

8. This Court has jurisdiction over Defendants under ERISA 29 U.S.C. § 1132. Defendants have caused events to occur in Arizona, out of which Archer's claims arise.

9. This Court has jurisdiction over the subject matter of this action under ERISA, 29 U.S.C. § 1132(a), (e), 28 U.S.C. § 1331 (federal question); and 28 U.S.C. §°2201-02 (declaratory judgments).

10. Defendants reside and are found within this District as defined by the jurisdiction and venue provisions of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132 and 28 U.S.C. § 1391.

## FACTUAL BASIS

11. Barclay is the plan administrator as defined by 29 U.S.C. § 1002(16)(A).

12. Barclay is the plan sponsor as defined by 29 U.S.C. § 1002(16)(B).

13. UHC Services, All Savers, UHLIC, and UHG are plan fiduciaries defined by 29 U.S.C. § 1102(a)(2).

14. The Plan's summary plan description ("SPD") is the Plan's written instrument.

15. Barclay obtained an All Savers Alternate Funding Insurance Policy Number #P500060 on January 1, 2018 ("Excess Loss Policy"). It renews annually on January 1 and covers 100% of the Plan's responsibility for any individual whose claims exceed $15,000 in a calendar year.

16. All Savers delegated claims adjudication to UHC Services.

17. UHC Services delegated utilization review to UHLIC.

18. Barclay and Archer paid all premiums due under the Plan.

19. UHG is directly liable for the acts of All Savers, UHLIC, and UHC Services.

20. Alternatively, All Savers and UHC Services are alter egos of UHG, or they are the instrumentality through which UHG acts or conducts business. (UHG, UHC, UHLIC and All Savers are collectively referred to as "UHC")

21. Archer underwent a protein-rich plasma/Fibrin injection in Texas on December 5, 2017, to treat lower back pain.

22. After the injection and despite pain medication, Archer experienced uncontrolled pain at the injection site.

23. On December 14, 2017, Archer arrived at Banner University Medical Center ("BUMC") ER in Phoenix, Arizona, complaining of progressive upper and lower extremity weakness and decreased motor function. Archer's knees were buckling, and he was having uncontrolled pain.

24. Testing and examination revealed that Archer had diffuse cervical and thoracic edema with osteomyelitis.

25. On December 15, 2017, Archer underwent an emergent C4-T1 laminectomy and C4-T2 fusion.

26. Archer stayed at BUMC until December 23, 2017, when he transferred to Banner's acute rehabilitation facility ("Banner Rehab").

27. Archer was a patient at Banner Rehab through January 20, 2018. His upper extremity strength improved, but not his lower extremity strength. UHLIC and UHC Services continually advised Archer that it would refuse to pay for another week of rehabilitation because of Archer's lack of progress. Archer's wife ("Carol") repeatedly lobbied UHC to provide continued rehabilitation care. UHLIC and UHC Services approved one final week at Banner Rehab, starting on January 20, 2018.

28. While UHC was approving acute patient rehabilitation a few days at a time, Carol began researching alternative rehabilitation facilities. UHLIC and UHC Services advised Carol that Scott could be discharged home and cared for in an outpatient setting. The prospect of having to provide care to Scott in their home in his then-current condition petrified Carol.

29. Carol located the Shirley Ryan Ability Lab ("SRAL") in Chicago. SRAL reviewed Archer's records and determined that he was medically capable of participating in acute inpatient rehabilitation.

30. SRAL is a contracted provider with UHC. UHC refused the request and confirmed that decision in a letter dated January 12, 2018. UHC determined that Archer's ability to perform self-care plateaued and that outpatient rehabilitation was the proper setting for his care.

31. Archer's condition worsened while at Banner Rehab. On January 20, 2018, Archer was emergently transported back to BUMC, where he was diagnosed with blood clots, pulmonary emboli and a pressure sore.

32. Archer recovered and was medically able to return to acute rehabilitation around January 27, 2018. BUMC sought approval from UHC to transfer Archer back to Banner Rehab. UHC denied the request because Archer was not an appropriate candidate for inpatient rehabilitation.

33. Archer's physicians advised UHC that inpatient rehabilitation was necessary for Archer and that Archer was fully-capable of participating in the required therapies.

34. In a letter dated January 23, 2018, UHC issued a written denial for readmission to Banner Rehab for continued therapy.

35. Archer received another letter from UHC dated January 26, 2018, again denying readmission to acute rehabilitation and denying Archer's care at BUMC from January 25, 2018, to his discharge on January 28, 2018.

36. Carol again contacted SRAL to determine whether it would accept Archer as a patient. SRAL agreed to admit Archer. No other closer acute facility would accept Archer given his co-morbidities following the blood clot/pressure sore.

37. On January 28, 2018, Archer flew in an air ambulance from Phoenix to Chicago. He was transported by ground ambulance to SRAL.

38. UHC denied payment for the flight from Phoenix to Chicago.

39. SRAL began treatment consistent with the recommendation and diagnosis from BUMC.

40. SRAL physician Allison Kessler-Vear, M.Sc., M.D., began to suspect that rather than a spinal cord injury, Archer lower motor neuron disorder ("LMN") versus a spinal cord injury and ordered two MRI's on Archer on February 20, 2018, and February 22, 2018, that confirmed the diagnosis.

41. SRAL adjusted Archer's therapy, treatment, goals, and progress milestones consistent with Archer's new diagnosis.

42. Archer's recovery followed a complicated course, but he progressed in his recovery and remained at SRAL until March 26, 2018, for a total of 57 days.

43. Archer appealed to UHC on March 6, 2018, and provided proof that his medically necessary treatment at SRAL was appropriate.

44. UHC acknowledged Archer's appeal in a letter dated March 15, 2018.

45. UHC denied Archer's appeal, claimed that it had considered all the evidence he provided, and concluded that treatment at SRAL was not medically necessary and that he could receive appropriate care at a skilled nursing facility.

46. UHC advised Archer that it has developed clinical policies.

47. The clinical policies are supposed to describe the "Generally Accepted Standards of Medical Practice, scientific evidence, prevailing medical standards and clinical guidelines" to support a UHC coverage or claim decision.

48. UHC defines Generally Accepted Standards of Medical Practice as:

> [S]tandards that are based on credible scientific evidence published in peer-reviewed medical literature generally recognized by the relevant medical community, relying primarily on controlled clinical trials, or, if not available, observational studies from more than one institution that suggest a causal relationship between the service or treatment and health outcomes.
>
> If no credible scientific evidence is available, then standards that are based on Physician specialty society recommendations or professional standards of care may be considered. The Claims Administrator reserves the right to consult expert opinion in determining whether health care services are Medically Necessary. The decision to apply Physician specialty society recommendations, the choice of expert and the determination of when to use any such expert opinion, shall be within the Claims Administrator's authority.

49. UHC's denial did not advise Archer whether it applied a clinical guideline or any other criteria it used to form the basis of the denial.

50. UHC advised Archer that it denied acute inpatient rehabilitation because it is "more costly than an alternative service(s) that is at least as likely to produce equivalent therapeutic or diagnostic results as to the . . . treatment of your Sickness, Injury, disease or symptoms."

51. On May 17, 2018, UHC advised Archer that it received new information related to his claim for services at SRAL.

52. The new information appeared to be a Peer Review Report from an unidentified physical medicine and rehabilitation board-certified physician, provided through MES Peer Review Services. The report concluded that some of the services provided during his stay at SRAL could be custodial care services, which All-Savers' policy excludes from coverage.

53. On May 23, 2018, UHC issued another denial based on information provided to UHC by SRAL on April 24, 2018. UHC advised Archer that it affirmed its denial. The

"principal reason" for this denial was that "[acute inpatient rehabilitation] is not clinically appropriate in terms of type, extent or considered effective for your sickness. The services could have been provided at a lower level of care."

54. Archer retained counsel, who sent a letter of representation to UHC on October 3, 2019, demanding payment to SRAL for treatment rendered from January 28, 2018 - March 26, 2018.

55. UHC acknowledged the demand on behalf of Archer in an e-mail dated October 3, 2019.

56. Around January 29, 2020, Archer received a refund check from SRAL.

57. UHC ultimately advised Archer's attorney that it reprocessed the bill and paid for the January 28-February 12, 2018 charges and issued a new explanation of benefits on November 30, 2019.

58. The November 30, 2019 explanation of benefits reflected payment for the approved timeframe but reaffirmed UHC's denial of the remaining days Archer stayed at SRAL.

59. Archer submitted another appeal to UHC on June 4, 2020.

60. UHC acknowledged Archer's appeal in a letter dated June 17, 2020.

61. Archer requested a status update on July 30, 2020. UHC did not respond.

62. As of the date of this Complaint, UHC has not responded to Archer's appeal.

63. Under 29 C.F.R. 2560-503-1(*l*)(1), Archer's appeal is deemed exhausted, and he is entitled to bring suit against Defendants.

**FIRST CLAIM FOR RELIEF**
**FAILURE TO PAY BENEFITS (29 U.S.C. § 1132)**

64. Archer incorporates all previous allegations.

65. All Savers entered into a valid and binding contract to provide health insurance coverage benefits for Archer.

66. UHC was required to provide all medically necessary services to Archer.

67. SRAL is an in-network contracted provider for UHC's health insurance products.

68. UHC failed to pay health insurance benefits due to Archer, despite being obligated to pay the benefits.

69. The Excess Loss Policy was already responsible for Archer's claims by the time he requested coverage for acute inpatient rehabilitation.

70. Because the regulations deem Archer's claim exhausted, this Court reviews the claim on a *de novo* standard.

71. Even if the standard of review were arbitrary and capricious, UHC operates under a serious conflict of interest in its claims administration and adjudication process. Every claim denied by UHC Services or UHLIC saves money for UHG and increases the parent entity's profit.

72. UHC has damaged Archer by its failure to pay Archer's medical bills.

WHEREFORE, Archer seeks damages against UHC as follows:

A. Award damages to Archer for his out-of-pocket expenses for medically necessary care denied by UHC.

B. Award damages to Archer for UHC's failure to provide proper benefits and coverage under Archer's medical insurance coverage in a sum to be determined at trial;

C. Award Archer the cost of this suit and reasonable attorneys' fees under 29 U.S.C. § 1132(g).

D. Award such other and further relief as the Court deems just and proper.

Dated:  December 21, 2020.

SCHIFFMAN LAW OFFICE, P.C.


By: */s/ Lisa J. Counters*
    Lisa J. Counters
    Attorney for Plaintiff